By the Court, Robertson, Ch. J.
The principal point arising upon the. appeal from the order denying the motion for a new trial upon the judge’s minutes, is whether there was enough ¿vidence to go to the jury upon the question whether the plaintiff signed the release set up in the answer, “ without knowing what it was, under the supposition that she was receipting for_2500 thalers, upon a return pro tanto of the loan she had made; that she signed it supposing she was simply signing a receipt for that money.” Which was submitted to the jury, and if answered in the affirmative by them, was declared by such judge to be fatal to the release. There was no other ground on which a verdict could have been found for the plaintiff. Assuming that it is a principle of law, that mere ignorance or mistake as to the contents of an instrument by a party executing it, however much the result of their own negligence or willful conduct, even although they have received a valuable consideration for executing it, is sufficient to invalidate it, without returning such consideration, yet that must at least be qualified by the sufficiency of all the circumstances preceding or attending such execution to induce a person of ordinary intelligence to infer that it was of the nature so supposed, even if no misrepresentation or misconduct of the opposite party be necessary. It would be monstrous to invalidate instruments upon the mere oaths of the parties executing them, that they did not know what they contained, or believed it to be something else than it really was, without a reasonable or plausible ground for such belief, in case they omitted to disclose their ignorance, or otherwise left the party in whose favor they executed such instrument unaware of it. No one, who parted with value on the faith of an executed instrument, would be safe, if that were the rule, without a minute examination and instruction of the party executing, , in the presence of witnesses, to ascertain if he knew the contents of the instrument and their legal effect.
The jury may be considered as having disposed of the question of the loan in controversy by their verdict, what *138 ever suspicions might attach to the evidence in favor of it, from the time when the first claim for it, known to any one hut the parties was made, or the circumstances of making it, or the relation of the parties, and the time and mode of repaying one half of it as stated by the plaintiff. The testimony of the plaintiff, that she supposed the paper she sign'ed was a mere receipt for such half of the loan, will not be sufficient to warrant the verdict of the jury, unless she had reasonable ground for such supposition. And it must be presumed that she could not have had such ground, if the facts known to her at the time of such execution, in the absence of any fraud or undue influence, were such as to have prevented any person of ordinary intelligence from supposing that such release was a mere receipt.
The sole ground upon which the plaintiff claims that she supposed such instrument to be a mere receipt was, that the defendant told her the night before, that if she would sign the paper, which was a mere receipt for half of the money she had lent him, he would give it to her, and the other half in two months; and she believed what he told her, that it contained a receipt for the 2500 thaler^ out of the money she had given him. This, apart from any other circumstances, would seem quite credible considering the relation of the parties. But those which preceded and accompanied such 1 execution, give a different color to the transaction.
The plaintiff was not illiterate, for she could read and write her native language, in which the release was written. She was disposed not to part with her rights, without fully understanding the mode of doing it, for she had just refused to sign a paper in English, because she could not understand it. She was not without assistance or advice, for her counsel drew the instrument, for which she paid him, and she executed it in his office, and in his presence. She had an opportunity of reading it, if she had chosen, and actually saw, when she signed it, the upper half of the last page as it was folded, which contained a release of all claims. *139 Her counsel, it is true, may have declined to read it, for want of time, on account of its length, yet that very length he attributed to that of the instrument brought to him by the defendant, the nature of which was made known to her on the previous interview. But she asked no questions, even as to its general nature, or why the previous arrangement of the breach of promise of marriage claim had fallen through, or why a mere receipt for money was so long.
Such instrument was executed on Monday morning, pursuant to an arrangement made on the previous Saturday afternoon.1 The plaintiff had that day employed counsel to enforce a claim for breach of promise of marriage, in consequence of a previous threat of the defendant to leave her. That counsel went the same day with her to the defendant’s office. After some conversation with the defendant, her counsel communicated to her a proposition he had made to pay her 5200 dollars in settlement of such claim. A dispute, which then arose as to the custody of the child, with which she was supposed to be pregnant, was finally arranged by the agreement under seal given in evidence, of the defendant to support such child until seven years old. That agreement was then reduced to writing in German by the plaintiff’s counsel, signed by the defendant, and, either on that occasion or on the following Monday, delivered to the plaintiff. Ho other claim was mentioned on that occasion as existing, except such breach of promise and the custody of the child. Hothing was said of any remaining 2500 thalers. 1 A paper drawn by the defendant’s counsel (Stemler) was then handed to the plaintiff’s counsel by the defendant, which was in English,' and which the plaintiff had refused to sign. The plaintiff not understanding that language, her counsel was requested by both parties to draw the instrument in German, and he drew the release in question, based on such instrument, according to what he understood to be the understanding of both parties, they having given instructions and information to him in each other’s presence in relation thereto.
*140 The plaintiff claims to have signed such release, solely because the defendant threatened to leave her ; unless she would agree to receive half the money he had borrowed from her, and give him a receipt for it, and to have received the defendant’s agreement from him, simply because it was given to her, without knowing what was in it. That although she retained it, she never read it, because, she was constantly sick. The defendant at first left her, but returned in two months, proposing to live with her again, and the first question she seems to have asked him was, What he had done with the paper she had signed ? His reply to which, (that he .had burned it,) satisfied her, for they resumed their former relations, and after living with him for some time, (how long does not appear,) she waited until two years after the supposed loan was made, to sue for the part unpaid, and never seems to have sued the defendant for the defined cause of action for damages.
The jury could only have arrived at the conclusion at which they did, upon the facts before them, by assuming first that between the Saturday, when the plaintiff had employed counsel to enforce a claim for damages for breach of promise of marriage, (made apparently in consequence of a threat of the defendant to leave her,) which counsel .had forthwith adjusted the claim, and the following Monday morning, when the arrangement was to be carried out and a release signed, it was discovered that' 2500 United States dollars were just equal to the half of 5000 Prussian thalers, (whether with or without interest does not appear,) and upon the defendant insisting that the plaintiff should take it for such half, and give a receipt therefor, leaving the claim which had been settled undisposed of, the plaintiff (moved by a similar threat to that which induced her to make such claim,) agreed to take that sum for such part of the loan and give a receipt therefor; that she allowed her counsel to remain in entire ignorance of the change of the arrangement, and * signed a paper drawn by him, which she knew was to have been drawn pursuant to the previous understanding, with *141 out asking any thing about it, although she had every reason to believe it was so drawn.
The release, as -drawn, (which included a discharge of all claims,), corresponded, as appears by uncontradicted testimony, with the understanding of the parties, and accorded with the instructions given on .the previous Saturday afternodn. The defendant had a right, therefore, to expect a release of that nature to be drawn for the sum he was to pay. The plaintiff must have known that a receipt for any particular claim was embraced therein.' The defendant had no motive, therefore, to use any threats to induce the plaintiff to accept the sum agreed upon, for one account more than another; or to persuade her that the instrument to be signed wouldmerely acknowledge the receipt of the money. On the other hand it is difficult to imagine, why the plaintiff should have exhibited so much reluctance, to give a receipt for the money as payment of part of a loan, instead of signing a release of all claims, or, (unless the settlement was a very good one,) to take the money on account of the loan, instead of the claim for damages, as to require a new threat of abandonment by the defendant to overcome it. And it is still stranger that, having employed counsel to take care of her interests, who negotiated the settlement and was employed in drawing'an instrument to carry it out, she wholly omitted to consult him as to the propriety of the change, or ask him any question as to the nature and effect of the instrument she signed, or to pursue the original claim. There' was certainly nothing done by her in his presence to induce such counsel to believe that the settlement was not in accordance with the previous arrangement, and that the instrument signed was intended to be a discharge of the claim for damages as well as all other claims. Indeed no other claim but that was ever disclosed to him by her. He had no reason to doubt her confidence in him, yet if any thing had passed favoring the idea that the paper signed was to be a receipt only, it must have awakened his suspicions. Her last instructions, on Saturday afternoon, had been to draw *142 a general release, and on Monday morning, although she supposed what he had drawn was a receipt for part of a loan, which had never been spoken of between them, she did not ask him how he knew any thing about the loan, or. came to draw a mere receipt, or whether the paper she signed was such. He was thus left in the dark as to any .change in the arrangement.
It is very plain that if the understanding of the parties, as fixed on the Saturday afternoon, had been carried put and the release was drawn by the plaintiff’s counsel according to such instructions, and the plaintiff had done what was agreed upon, the present cause of action would have been taken away. In good faith she was bound to carry out that agreement whatever the defendant did. She has actually carried it out by signing the release. If allowed to stand, it will accomplish the first agreement of the parties, and in equity it ought to be enforced. Should her bare recollection of her impression as to the nature of the paper, although inconsistent with circumstances known to her, and contrary to all probability, and standing alone, be permitted to invalidate it ?
It is a circumstance somewhat worthy of note if the payment was to be of a loan, that the money paid was United States currency, and the money lent Prussian. ' The complaint alleges that the money lent was worth $5250. A witness on the trial testified that a Prussian thaler was always worth seventy-one cents in gold, which would make the sum lent only $3750 in gold. To raise its value to $5000 would require a premium on gold of nearly forty-one per cent, and to raise it to $5250, one of nearly forty-eight per cent. One witness, who obtained his knowledge of their value only by American newspapers seen in Europe, made the highest value in July, 1863, the date of the loan, ninety-eight cents. Another, who was then a soldier in the United States army, fixed it at a dollar, although it does not appear from whence he derived his information. It is not strange that a sum ($2500) should be taken in satis *143 faction of a claim of damages for breach of promise of marriage,.but it is a little extraordinary, in the absence of any explanatory evidence, that just that sum should be given and received to pay half of a debt of 5000 Prussian thalers, whose value was indefinite, without any discussion, particularly as it does not appear that any thing was said about the interest.
The plaintiff knew, then, when signing the release that the only instructions "she had given her counsel were to draw such a paper, and that he had had no instructions from her intermediately. That the' paper signed by the defendant related to the custody of her unborn child, and was part of the original settlement. She saw that the paper signed by her occupied more than a page, and was long enough to be folded. She was informed by her counsel that it was too long to read, and was rendered so by the paper drawn by the defendant’s counsel, which she had refused to sign, and which was handed to him in her presence, to be re-written in German, and she understood it to relate to the claim for damages previously compromised; Without any inquiry as to the nature of the paper, merely because the defendant had told her it would be a receipt, and threatened anew to leave her if she didn’t sign it, she assumed that it was nothing but a receipt. No one of ordinary intelligence, exercising ordinary caution, under the circumstances under which such paper was prepared, and without further information, could or would have believed that a mere receipt had been drawn and was the paper signed, when it had only been spoken of the evening before between the parties, in the absence of counsel. Her subsequent conduct belies such belief. The first question she seems to have put to the defendant, after carrying out his threat and living apart for two months, upon his proposal to return, was, What he had done with the paper she had signed ? It would have been a matter of no consequence if it had been only a receipt. He seems to have understood the object of the°question, and answered he had burned it; *144 it was a scandal to carry about. She could not have understood him to refer to a mere receipt for money lent; hut she immediately resumed her former relation. It is also remarkable that before the release was produced, and on the trial the plaiptiff testified, that she had demanded from the defendant the whole of the loan, in April and May, 1864, which was after the release-was signed, as well as in March, when it was signed, and when the defendant, as she testified afterwards, was endeavoring to induce her to take, and give a receipt for, one half, even threatening to leave her if she didn’t, while" after the release was produced she testified that during their renewed cohabitation, which begun two months after it was signed, she only asked for one half.
A belief of the plaintiff that such release, when she signed it, was a mere receipt, was clearly inconsistent with what had previously occurred within her knowledge; contrary to the evidence of her senses; and in the absence of any thing done on the part of her counsel to encourage it, wholly unaccountable. She must, in order .to believe so, have supposed that the defendant was anxious to pay a debt for which he was not pressed, instead of a demand for which he was; that her counsel had neglected his duty by drawing an instrument which she had not instructed him to prepare, in place of one which she had, and that, too, without any directions from her; that an instrument three or four pages long was a mere receipt; that it needed counsel to prepare it; and although she knew its length was due to a paper which she had reason to believe was a release of all claims, she continued to believe it was only a receipt. Such a belief was too irrational to have been submitted to the jury, as a ground of invalidating the release. It would be subversive of every principle of justice to allow á party who had signed an instrument, and received the consideration for signing it, to avoid it by swearing to her mere supposition of its nature as being different from what it really was, in the face of every proof to the contrary. The *145 motion for a new trial, upon the ground of the verdict being without evidence, I think, should have been granted. This, however, might subject the defendant to the costs of the former trial; and it becomes, therefore, necessary to examine whether any of the exceptions on the trial, to the admission or rejection of evidence, were well taken.
In the first place, if the value of a Prussian thaler was of any consequence in the case, it is very evident that neither of the witnesses offered for the purpose showed himself possessed of the proper knowledge of the value in New York at the time of the supposed loan, in .July, 1863, to enable him to testify. One was in Europe and the other in the United States army. The former (Stalknecht) acknowledged himself unable to testify precisely as to such value, and based his calculations upon the value of gold as reported in newspapers which he read in Europe. I am not aware of any rule making newspaper reports of value, evidence. The other witness (Ternow) did not explain how he was able to ascertain the value of a thaler in New York, while serving in the army elsewhere. Indeed he did not state his means of knowledge at all. Neither of those witnesses were experts, and the admission of the questions put to them was erroneous.
The questions also put to the plaintiff, whether she commenced certain suits against the defendant in the year 1865, were relevant. It did not appear on the trial when she discovered the paper she signed to be something more than a receipt, but it appeared that she ascertained, as she supposed, that the defendant had burned it, two months after she executed it. She had employed counsel to draw it, as a release of a claim for damages for breach of promise of marriage, which she employed him to press. If, therefore, she brought an action for that cause in January, 1865, and not until then, it would go to show that until she had reason to believe the release was destroyed, she made no claim, and therefore must have thought such release a good bar to it. The action for 2500 thalers would also go to show that *146 no claim was made until it was commenced for the residue of the loan, and then that for $5250, which was the present action, would tend to show the staleness and want of good faith of the claim.
The questions as to the marriage of the parties were also improperly excluded. Whether a wife can sue her husband in a common law action, for moneys lent, is not yet settled. She cannot, however, be a witness against him, and the defendant had not waived the objection against the plaintiff’s competency by allowing her to be examined in chief. (Seeley v. Engell, 13 N. Y. Rep. 546.) Her statement also in a complaint in an action, of her marriage, was likewise proper evidence to show her in competency.
I cannot perceive that the widest liberty of cross-examination could make the questions as to the illicit relations between the parties, put to the defendant on his cross-examination, relevant to any fact in issue, or lead to any discovery material to the merits. They did not tend to prove the loan of the money in controversy, and were as fatal to the moral character of the plaintiff as to that of the defendant, if that was to affect their credibility. They may have possibly awakened some sympathy on the part of the jury to control their judgment, but were otherwise immaterial.
For such erroneous admission and exclusion of testimony, the judgment should be reversed, and a new trial had, with ■costs to abide the event.